IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD LEMPA | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 05-985 |
| | : | |
| v. | : | |
| | : | |
| ROHM AND HAAS COMPANY, | : | |
| | : | |
| Defendant. | : | |

**Jones II, J.**                                                                                    **December 29, 2009**

## MEMORANDUM

### I.  Introduction and Procedural Background

Plaintiff Edward Lempa ("Plaintiff"), a former employee of Defendant Rohm and Haas

Company ("Defendant" or "RH"), has sued RH for a severance benefit offered under a Severance

Benefit Program ("SBP") contained in the RH Retirement Plan ("Plan").  Plaintiff, who retired

from RH in March 2003, filed his complaint in May 2005, contending that he was constructively

discharged in order to prevent him from receiving a SBP benefit in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. and the age

discrimination provisions of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. §

951, et seq.  Plaintiff also pled breach of contract claims in the first complaint.  In an Order dated

March 20, 2007, the Hon. R. Barclay Surrick granted a motion to dismiss the contract claims as

preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), because the

SBP benefit was part of an ERISA plan.  In that same Order, Judge Surrick granted leave for

Plaintiff to amend his complaint by adding a claim under Section 510 of ERISA, 29 U.S.C. §

1140, for unlawful interference with benefits.  Plaintiff filed his amended complaint on April 20,

2007.  On May 9, 2007, Plaintiff filed a motion for leave to file a second amended complaint to add a breach of fiduciary duty claim under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). In both the existing Section 510 claim and the proposed Section 502(a)(3) claim, Plaintiff sought the SBP severance money as part of his relief.

On May 23, 2007, Defendant filed an opposition to Plaintiff's motion to add the Section 502(a)(3) fiduciary duty claim.  On May 25, 2007, Defendant moved to dismiss Plaintiff's existing Section 510 claim.  On December 7, 2007, Defendant filed a motion for summary judgment.  On April 28, 2009, this matter was transferred to the docket of Judge C. Darnell Jones II.  On July 6, 2009, the Court denied Plaintiff's motion for leave to file a second amended complaint, leaving only the three existing counts in the amended complaint.  On July 14, 2009, the Court granted Defendant's motion to dismiss Count III (ERISA section 510 claim) of the amended complaint, leaving only the ADEA and PHRA age discrimination claims.  Briefing has concluded, and now before the Court is Defendant's pending motion for summary judgment on those remaining claims (Docket No. 34).

Upon close and careful consideration of the parties' lengthy briefs and statements of facts, the Court concludes that there are no disputes of material fact that would present a genuine issue for trial, and finds that Defendant is entitled to summary judgment as a matter of law. Accordingly, for the reasons discussed *infra*, the Court will grant the motion.

## II.  Facts

The Court will detail the facts it has concluded to be undisputed.  Many of these facts come directly from (or are not contradicted by) Plaintiff's own deposition and relevant exhibits. This case involves a lengthy factual scenario, and Plaintiff asserts a number of disputes of

material fact.  Upon close examination, however, the Court does not find such to exist. In fact, the Court finds that in an effort to zealously advocate on his own behalf, Plaintiff has artfully characterized some of the facts to appear material and genuinely in dispute, yet, an in-depth analysis indicates such disputes do not exist.  Additionally, Plaintiff has relied upon allegations and argument without specific record support.  "A party will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial."  In re IKON Office Solutions Inc. Securities Litigation, 277 F.3d 658, 666 (3d Cir. 2002).[1]

Nevertheless, where Plaintiff has claimed that a particular material fact is indeed in genuine dispute, the Court will address such assertion in a footnote.  If the Court does not discuss a fact at all, it is because the Court has concluded that such fact is irrelevant or immaterial and thus not worthy of discussion.

Plaintiff was born on July 27, 1941.  (Pl. Dep. at 4).[2]  He began working for RH in May 1967.  On February 25, 2003, Plaintiff informed RH that he intended to retire, and subsequently retired effective March 31, 2003.  (Pl. Dep. at 5).  At the time of his retirement, Plaintiff was

---

[1] The parties have engaged in a bit of wrangling over whether the testimony of "interested witnesses" (here, several RH employees) may be relied upon to support a motion for summary judgment.  Defendant's position is correct and the Court may so rely.  See Lauren W. v. DeFlaminis, 480 F.3d 259, 271-72 (3d Cir. 2007); Still v. Cummins Power Sys., No. 07-5235, 2009 WL 57021 at *8-9 (E.D. Pa. 2009).

[2] Except where Plaintiff's contention is referenced in footnotes (where Plaintiff's factual citation format will be used as necessary), the Court generally adopts Defendant's factual citation format (i.e., ___ Dep. at ___).  The referenced depositions are included in exhibits contained in Defendant's Appendix of Exhibits to its motion for summary judgment.

sixty-one (61) years old and had thirty-five (35) years of service with RH.

Plaintiff worked in different jobs and at different sites during his RH employment.  In 1994, Plaintiff transferred from the Philadelphia Plant to a salaried Electrical/Instrumentation ("E/I") technician position at the Bristol Plant.  In late 1999, Bristol Plant Maintenance Manager Curt Diehl ("Diehl") asked Plaintiff to assume a temporary foreman position supervising E/I mechanics.  (Diehl Dep. at 56-57).[3]  In or about May 2000, Plaintiff was promoted to E/I shop foreman in the Bristol Plant Maintenance Department with foreman responsibilities over the E/I mechanics.  (Pl. Dep. at 38).  In connection with that promotion, Plaintiff received a $2000 annual salary increase.  (Pl. Dep. at 49).  From May 2000 until March 2003, Plaintiff worked as the E/I shop foreman at the Bristol Plant. There was a separate mechanical shop at the Bristol Plant, which included pipe fitters, machinists, and riggers that was supervised by a mechanical shop foreman, Fred Gillen.  (Pl. Dep. at 38-41).  Until October 2002, the two Bristol Plant maintenance shop foremen reported to Diehl.  The Bristol Plant, which manufactured chemicals, organizationally also had a Production Department, which at all material times was supervised by Production Manager Todd Salerno ("Salerno").  Plaintiff understood that in his job as E/I shop foreman, his customers were the Production managers in need of E/I maintenance.  (Pl. Dep. at

_____

[3] Plaintiff highlights that Diehl assured Plaintiff that accepting the supervisor job "would not eliminate [his] chances of taking the SBP," (A79-90: Diehl dep. at 72:14-73:10; 76:1-3), and that Diehl told Plaintiff that RH would "keep the SBP available for you..."  (A115: Lempa dep. at 199:1-8).  Defendant does not disagree with the quotes.  Plaintiff contends that these quotes somehow support the claim that the SBP became part of Plaintiff's official compensation package.  However, this argument is without record support and does not create a disputed issue of material fact.  These quotes merely indicate that the SBP would be available to Plaintiff if his new supervisor position were eliminated, as set forth in the Plan.  Statements that the SBP would remain "available" or "open" do not equate with entitlement, and Plaintiff has presented no evidence to the contrary.

79-80).

The SBP is provided under the RH Plan (Pl. Dep., ex. 14). Article XI of the Plan provides for a special Involuntary Early Retirement Pension benefit for plan participants who retire on an "Involuntary Early Retirement Date" before December 31, 2003, and it is that benefit that is commonly referred to as the SBP. (Pl. Dep., ex. 14 at p. 37). Section 11.2.1 of the Plan makes clear that eligibility for the SBP is contingent upon certain qualifying events, specifically "job elimination, reduction in workforce, restructuring, reorganization or other similar nonperformance related reasons (including, but not limited to, redefining the essential functions of a position)." (Id.) The SBP calculation is described in Section 11.1.2 of the Plan, which provides for a cash lump sum payment calculated by multiplying a percentage (4% for each year of service up to a maximum of 100%) by the participant's annual salary. (Id.)

A Summary Plan Description ("SPD") for the Plan was issued to employees in May 2002. (Pl. Dep., ex. 13). The SPD presents the SBP eligibility requirements as follows:

> The "SBP", or Severance Benefit Program, provides a special benefit to you if you are 100% vested in your benefit and if you also meet all of the following requirements:
>
> ... you are formally notified that your employment with the Company is being terminated for a non-performance related reason, including but not limited to:
>
> > - job elimination;
> > - a change in the essential requirements of your position;
> > - reduction in workforce; or
> > - Company reorganization or restructuring.

(Pl. Dep., ex. 13 at p.12). Accordingly, eligibility for a SBP depends on RH taking the aforementioned specified action and not on the desire of any particular employee to obtain

special benefits.  (Id.)  Specifically, the SPD states, "You are not able to 'volunteer' for the SBP

– you must be informed by management that you are scheduled for termination for any of the

above reasons."  (Id.)  The Plan documents identify conditions that would render a participant

ineligible to receive a SBP.  (Pl. Dep. at exs. 13, 14).  Section 11.3 of the Plan states that a

participant "shall NOT be eligible to be an IERD Participant if any of the following conditions

apply:

> 11.3.1.  The Participant's employment is terminated for
> failure to satisfactorily perform the essential duties of the
> individual's employment, a violation of law (other than a
> traffic violation or other minor civil offense), or behavior
> that the Participating Employer determines constitutes a
> material breach of any Participating Employer policy or
> provision of the Employee Code of Business Conduct, and
> including, by way of example and without limitation:
> dishonesty; conduct detrimental to the Participating
> Employer's best interests; a material conflict of interest;
> revealing confidential or proprietary information of the
> Participating Employer; or abuse of the voucher or
> reimbursement processes of the Participating Employer."

(Pl. Dep., ex. 14 at p.38).[4]  The SPD also cautions employees: "Before making any decision that

may affect the amount and timing of a distribution to you from the Plan, you should be sure to

consult with the Rohm and Haas Benefits Center or your local Human Resources representative."

(Pl. Dep., ex. 13 at p.1).

　　　In 2003, RH provided health care benefits for eligible active and retired employees under

the Rohm and Haas Company Health and Welfare Plan (the "HW Plan").  (Ex. E).  The

---

[4] Plaintiff attempts to dispute the eligibility criteria for the SBP by pointing to the fact that
"[t]he program allowed employees to express their interest in separating with the severance
benefit by filling out a form."  (A21: P-342; A23: P-352).  These citations, however, make it
clear that the eligibility criteria remained in place, and that eligibility was tied to the elimination
of a job, not an individual's personal desire to separate from RH.

eligibility requirements for retiree health care benefits under the HW Plan are set forth in

Appendix B to the HW Plan, which provides under Article I, Section 1.6:

> "Eligible Retiree" means, for purposes of determining
> eligibility to continue to receive retiree medical, dental or
> life insurance Benefits under the Group Health Benefits
> under the Plan, any of the following Former Employees:
>
> 1.6.1 Eligible Former Legacy Rohm and Haas Employees
> Retiring On or Before December 31, 2003 Who Meet the
> Following Conditions:
>
> … (b) 60/15 Employees. The Employee (I) has been credited
> with 15 or more aggregate years of Benefit Service, (ii)
> retired after attaining age 60, and (iii) was actively employed
> on the date they attained age 60.

(Ex. E at D480). For those employees (like Plaintiff) who satisfied the age and service elements,

the HW Plan imposes no other conditions or eligibility criteria for retiree health care. (Id.)

The term "Eligible Former Legacy Rohm and Haas Employees" is defined in Section 1.10

of Appendix B to the HW Plan as "any former employee of a Rohm and Haas Company location

who retired in good standing from such location, and who was, at the time of retirement, an

Eligible Employee as defined in Article I of the Plan proper." (Ex. E at D482). Article I, Section

1.19 of the HW Plan (i.e., the "Plan proper") defines an Eligible Employee as one who is

"scheduled to perform at least 20 hours of service on a weekly basis for the Company." (Ex. E).

The SPD for retiree health care benefits, entitled "Your Retiree Benefits," presents a limited

basis for disqualification for retiree health care benefits: "You should be aware that employees or

retirees may forfeit all Company-paid health coverage, including any dependent coverage, in

cases where there is gross misconduct that would constitute grounds for immediate termination

of employment." (Pl. Dep., ex. 3 at p.3). Similarly, the SPD for the HW Plan states that

employees who satisfy age and service requirements are eligible for retiree health care: As a retired employee of Rohm and Haas, you are eligible for Company-sponsored health and dental coverage throughout retirement if you: … were at least age 60 and had completed at least 15 years of service when you retired. (Pl. Dep., ex. 3 at p.2). Nothing in the HW Plan or the SPD for retiree health care benefits states that an employee who satisfies the age and service elements for the retiree health care benefit would lose eligibility for retiree health care if he/she was terminated for poor performance. (Pl. Dep. at ex. 3; Ex. E). No one at RH ever told Plaintiff he would not receive retiree health care benefits if he was terminated for poor performance. (Pl. Dep. at 36-37).[5]

At the time he was promoted to the E/I shop foreman position in May 2000, Plaintiff understood that his E/I technician position was going to be eliminated in a restructuring, and that therefore he would likely be eligible for a SBP. (Pl. Dep. at 195-196). Prior to accepting the foreman position, Plaintiff asked Diehl whether the SBP would still be "available" to him in that position. (Pl. Dep. at 197). Specifically, Plaintiff asked Diehl, "Well, find out if down the road the SBP is still going to be available." (Id.) Diehl later told Plaintiff that Plaintiff would still be

---

[5] In response to this fact, Plaintiff relies on the assertion that Janice Holt ("Holt") from Bristol Human Resources neglected to tell Plaintiff that his retiree health benefits were secure, even if Plaintiff were terminated for poor performance. This does not create any fact dispute: the undisputed fact is that Plaintiff *never asked* Holt anything that would result in such a revelation. The rest of Plaintiff's Additional Facts in Support of Dispute on this point are also mere argument unsupported by the record. The record reflects Plaintiff admitted the criticisms he received from Diehl in October 2002 and Salerno in February 2003 were reasonable and could be accomplished. (Pl. Dep. at 67-68, 75, 77-79, 103-113). Likewise, Plaintiff's contention that he received two "notices of intent to terminate" is unsupported in the record. The record reflects that Plaintiff received two performance reviews and needed to improve based thereon – *not* that he was told he was being terminated.

eligible to get a SBP in the future if his new job was eliminated.[6]  (Id.)  Plaintiff never received

anything in writing that promised or guaranteed a SBP.  In May 2000, Plaintiff wanted to keep

working for RH; it was his intention (which he shared with Diehl) that he wanted to continue to

work until he reached "the magic number of 62," *i.e.*, July 2003, at which time he would become

eligible for Social Security.  (Pl. Dep. at 203-204).[7]

During 1999 to 2002, there were a number of recurring areas of improvement/deficiencies

identified in Plaintiff's performance evaluations.  In Plaintiff's 1999 review, Diehl stated three

areas of "Challenges/Improvements" for Plaintiff to work on in 2000, including "enforce the

need for each mechanic to communicate job status/completion of job to process foreman;" "drive

cultural change toward proper break times and lunch times, as per contract rules;" and

"[c]onsistently complete a weekly safety sample."  (Pl. Dep. at 225-226 and ex. 20).  Plaintiff

admits that these challenges identified by Diehl were reasonable to expect of Plaintiff in his new

role as E/I shop foreman that he assumed in 2000.  (Pl. Dep. at 227-28).  In Plaintiff's

performance review for 2000, Diehl identified a number of "Challenges/Improvements" for 2001

that, just like his prior list of "Challenges/Improvements" for 2000, reiterated that Plaintiff

needed to: "Explain and enforce the need for each mechanic to communicate job

_____

[6] Again, Plaintiff attempts to create dispute of material fact by relying on the assertion
that Diehl assured Plaintiff that accepting the supervisor job "would not eliminate [his] chances
of taking the SBP," (A79-90: Diehl dep. at 72:14-73:10; 76:1-3), and that Diehl told Plaintiff that
RH would "keep the SBP available for you..."  (A115: Lempa dep. at 199:1-8).  See note 3,
*supra*.

[7] Although not directly relevant given the above facts, it is worth noting that Diehl was
never authorized or designated by RH or by the Plan to advise RH employees of their rights and
benefits under any part of the Plan, including the SBP.  (Diehl Declaration at ¶3 in Exhibit G of
Defendant's Appendix), and Diehl asserts that he never told Plaintiff that he was authorized or
designated by RH or the Plan to advise Plaintiff of rights or benefits under the SBP.  (Id.)

status/completion of job to process and/or utilities foremen;" "Continue to drive cultural change toward proper break times and lunch times, as per contract rules;" and "Consistently complete a weekly safety sample." (Pl. Dep. at ex. 21). In addition, Diehl identified three new "Challenges/Improvements for 2001": "Day to day communication of job status with production Planners/Schedulers, Shift Foreman, Utilities Foreman and other managers;" "Complete the task of moving the E/I shop by end of March 01;" and "Timely submittal of 'as built' electrical diagrams to our design room, upon upgrades to field wiring." (Pl. Dep. at 230 and ex. 21). Plaintiff admits that all of these "Challenges/Improvements" for 2001 were reasonable to ask of him in his job as E/I shop foreman. (Pl. Dep. at 230). Diehl's handwritten attachment to this 2000 review of Plaintiff listed six (6) areas "to improve," including: the need to do weekly safety samples; the need to begin the preventative maintenance (PM) program; the need to improve the productivity of the mechanics; and the need for mechanics to complete computer based training (CBT). (Pl. Dep. at ex. 21).

As part of this 2000 review, Diehl also provided Plaintiff with a separate list of "Expectations for 2001." (Pl. Dep. at 240-41 and ex. 24). Among other things, this list of expectations reiterated the need to complete safety sample audits, to promote housekeeping practices and conduct housekeeping audits, and to "interface" with maintenance and production planners/schedulers. (Pl. Dep. at ex. 24). Plaintiff admits that all of the expectations identified by

Diehl for 2001 were fair and reasonable. (Pl. Dep. at 241). In his review of Plaintiff's performance for 2001, Diehl presented a number of "Key Development Improvement areas" that had been identified in prior reviews, such as, "Consistently complete weekly safety sample";

"Foster/engage in professional dialogue with production contemporaries"; "Keep production planner/schedulers informed of shop repairs when equipment is down." (Pl. Dep. at 239-40 and ex. 23). Plaintiff admits that these improvement areas were all reasonable expectations. (Pl. Dep. at 239). As in 2001, at the beginning of 2002, Diehl also provided Plaintiff with a written list of expectations, much of which mirrored the expectations list for 2001. (Pl. Dep. at 241-42 and ex. 25). Plaintiff admits that this list of expectations for 2002 was fair and reasonable. (Pl. Dep. at 241-242).

When Diehl was the Bristol Plant Maintenance Manager, he sent customer satisfaction surveys to the Maintenance customers (*e.g.*, Production Managers) (Diehl Dep. at 94-95). The few surveys returned to Diehl pertaining to Plaintiff were generally negative. (Pl. Dep. at ex. 26). For example, in one survey dated December 2000, Plaintiff was rated a 1/poor in customer focus/interest and a 2/fair in interpersonal skills with a written comment that Plaintiff "need[ed] to be more customer oriented." (Id.) Another survey dated December 2000 rated Plaintiff a 2/fair in customer focus/interest with a written comment that Plaintiff is "not proactive at all" and rated Plaintiff a 2/fair in interpersonal skills with a written comment that "lots of B.S. given when asking about progress on jobs." (Id.)

In September 2002, there was a change in senior management responsibilities for the Bristol Plant. (Montg. Dep. at 6-10). The former Area Manager for the Bristol Plant was let go, and for the last three and a half months of 2002, Bristol Site Manager Montgomery assumed the additional responsibilities of the Bristol Plant Area Manager. (Montg. Dep. at 6-9). At that time, Montgomery concluded that the performance of the Bristol Plant was "significantly inadequate," and he told the Bristol leadership team that changes needed to be made and performance

standards had to be raised. (Montg. Dep. at 28-29). As Montgomery put it, there was "a significant change in calibration of what was acceptable." (Montg. Dep. at 29). Montgomery identified a disconnect between the way in which managers at the Bristol Plant viewed their performance, and the way in which he viewed their performance. (Id.) Montgomery testified, "I think in general the [the Bristol Plant organization] felt internal to themselves that they were doing an adequate job, but from an outside perspective, including the business's perspective, the organization was not doing an acceptable job." (Id.) Therefore, Montgomery instituted higher standards and raised expectations applying to all employees at the Bristol Plant. (Montg. Dep. at 30). Plaintiff acknowledges that the heightened performance standards under Montgomery applied to everyone at the Bristol Plant, including Production and Maintenance. (Pl. Dep. at 168-69). For example, Michael "Smith,"[8] a Production foreman at the Bristol Plant who reported up to Salerno, was terminated under the raised performance standards by Salerno on May 14, 2003. (Salerno Dep. at 140-44). Plaintiff knew Smith to be much younger than him; at the time Smith was discharged, Smith was 43, i.e., 18 years younger than Plaintiff. (Pl. Dep. at 149-150; Answer to Plaintiff's Interrogatory No. 5 at Exhibit I in Defendant's Appendix). Smith did not receive a SBP. (Ex. I, supra).[9]

In September 2002, there was an offsite performance feedback meeting attended by

_____

[8] Last name has been changed to protect privacy.

[9] Prior to being discharged, Smith was given a "T-chart" of performance improvement items by his immediate supervisor in Production, Rich Kiesling. The "T-chart" approach to performance management was unique to Kiesling. (Salerno Dep. at 139). Plaintiff worked in the Maintenance Department, and therefore, did not report to Kiesling, who was in Production. Smith's T-Chart results are, therefore, of no material importance to the evaluation of Plaintiff's performance.

Montgomery and by all the Production and Maintenance managers at the Bristol Plant, such as Salerno and Diehl. (Diehl Dep. at 138-141). At that offsite meeting, Diehl received "very strong" negative feedback about Plaintiff's performance from the customers in the Production Department. (Id.) Diehl summarized that feedback from Plaintiff's customers in an October 2002 performance review, which review he delivered to Plaintiff shortly before he transferred to a different position at the adjacent Croydon facility. (Diehl Dep. at 138-41; Pl. Dep. at ex. 8). Plaintiff admits that the source of the customer feedback and the deficiencies identified in Diehl's October 2002 review was the negative feedback from the Production managers at the September 2002 offsite meeting. (Pl. Dep. at 79-80). Diehl gave Plaintiff this performance review on or about October 17, 2002. (Pl. Dep. at 57). In that review, Diehl identified a number of "Deficiencies in current role," including: "Completing assigned tasks in a timely manner"; developing a shift turnover log; improving housekeeping within the shop area; completing safety samples in a timely fashion; moving bulging Freon drums into a shed; and having a mechanic fill out proper paperwork. (Pl. Dep. at ex. 8). In this review, Diehl also wrote that Plaintiff continued to have poor communication with customers, particularly production managers. (Id.) Plaintiff admits that all of the deficiency areas identified for improvement in the October 2002 review were reasonable (with the exception of the uniform policy that Plaintiff could not control). (Pl. Dep. at 67-68, 75, 77-79). Specifically, Plaintiff admits that he was not doing one safety sample per week (id. at 67); and that developing a shift turnover log was a reasonable request (id. at 68), as was housekeeping within his shop (id. at 75), moving bulging Freon drums (id. at 77), and having the RV (or relief valve) mechanic complete proper paperwork (id. at 78-79). The October 17, 2002 review also had a section entitled "Customer

satisfaction feedback indicates frequent poor results, overall." (Pl. Dep. at ex. 8). The customer feedback was that Plaintiff had "poor communications of work status with managers"; had "poor interaction with key managers," such as the Production Managers; demonstrated "poor initiative to correct productivity problems within the E/I shop"; and demonstrated "poor initiative in driving safety performance of mechanics." (Pl. Dep. at ex. 8). Plaintiff admits that it was reasonable to expect of him to have good communication of work status with Production Managers; to have good interaction with key managers; and to exhibit initiative in improving mechanic productivity and driving safety. (Pl. Dep. at 80-82). Diehl cautioned Plaintiff that, "[i]f you do not show improvement and add more value to this organization over the course of the next 3 to 4 months, you may find yourself being asked to leave." (Pl. Dep. at ex. 8). Finally, Diehl noted that the current site manager (Montgomery) was not in favor of granting Plaintiff a SBP because "[i]t is not company policy to grant SBP's as a way to remove poor performers from our ranks." (Id.)

Plaintiff did not respond to this October 17, 2002 performance evaluation or the stern warning therein by quitting or seeking a transfer. Rather, Plaintiff continued in his role as E/I shop foreman. Plaintiff's view was that the proper response to his negative October 2002 review was to go out and do a better job. (Pl. Dep. at 63-64).

After Diehl left for the new job at the Croydon Plant, Production Manager Salerno assumed the additional responsibilities of the Maintenance Manager position. (Salerno Dep. at 10-12; Salerno Decl. at ¶1). Plaintiff admits that Salerno acted professionally toward him in all interactions from October 2002 through March 2003 when Plaintiff retired. (Pl. Dep. at 83-84). On January 12, 2003, Plaintiff sent Salerno an e-mail message stating that he had "decided to

retire if I am offered the Severance Benefits Package." (Pl. Dep. at 209-210 and ex. 15). Plaintiff describes this e-mail as "my notice to Salerno and the rest of the group that I was interested in retiring." (Pl. Dep. at 209). Because Salerno was not familiar with the terms of the SBP, he forwarded Plaintiff's January 12, 2003 e-mail to the Human Resources department and did not respond to it. (Salerno Dep. at 91-95).

On February 14, 2003, Plaintiff received an annual performance review from Salerno in a meeting also attended by Holt from Bristol Human Resources. (Pl. Dep. at 84-85 and ex. 9). Both Salerno and Holt acted professionally toward Plaintiff during this meeting. (Pl. Dep. at 99-100). In that written review, Salerno first tracked Plaintiff's performance with respect to the areas of needed improvement identified in Diehl's October 2002 review, and concluded that none of those items had been accomplished (except for the moving of bulging Freon drums to the catalyst shed). (Pl. Dep. at ex. 9). Salerno gave Plaintiff an overall rating of unsatisfactory with a strong message that Plaintiff's performance had to improve immediately (*i.e.*, within 30 days).[10] (Id.) Salerno did not leave his expectations for performance improvement to generalities. (Pl. Dep. at ex. 9). Rather, at the end of the February 2003 review, Salerno spelled out seven specific changes Plaintiff would be required to "demonstrate as a requirement for continued employment." (Id.) These specific changes included several carryover items from reviews dating back to 1999-2000 (*e.g.*, need to improve housekeeping; need to complete weekly safety samples) and also included other items such as: the need to monitor progress on E/I jobs; the need to track and chart planned versus actual hours spent on E/I jobs; and the need to document

---

[10] Plaintiff's compensation for 2003 was left unaffected as a result of this review (*i.e.*, no increase or decrease). (Salerno Decl at ¶3). Plaintiff's job title and work location also remained the same after this review. (Id.)

the number of hours charged to particular work orders. (Id.) Salerno spent the majority of the February 2003 performance meeting addressing these specific improvement areas so Plaintiff "clearly understood where he had to improve."[11] (Salerno Dep. at 108-109). Significantly, Plaintiff admits that each of the specific changes Salerno listed in the February 2003 review was reasonable and could be accomplished. (Pl. Dep. at 103-113). In this review, Salerno also committed to meeting with Plaintiff weekly to review performance. (Pl. Dep. at ex. 9).[12]

The Bristol Human Resources manager inserted a sentence in this February 2003 review that essentially repeated the statement from Diehl's October 2002 review that the SBP could not be used as a vehicle to remove poor performers. (Salerno Decl. at ¶2). Plaintiff was not told that he would not receive a SBP if his job was eliminated in a reorganization or restructuring, and he

---

[11] Plaintiff asserts that he disagreed with the review and felt the tasks listed by Salerno were "overwhelming," but would "give it a shot." Plaintiff himself admitted at length, however, that the review and tasks were reasonable. (Pl. Dep. at 103-113). There is no dispute of material fact.

[12] Plaintiff engages in a strange and lengthy comparison of the way RH treated Plaintiff versus the way it treated a younger employee, Mike "Smith". First, these claims do not contradict the fact at which they are directed – namely, that Salerno committed to meet weekly with Plaintiff. Second, this entire line of factual exposition is irrelevant and immaterial because (a) Smith had a different supervisor and was analyzed under a different rubric; (b) both Plaintiff and Smith were given performance warnings in February 2003; © Smith was fired under the raised performance standards by Salerno on May 14, 2003; and (d) Smith did not get a SBP benefit. (see Salerno Dep. at 140-44). Third, the assertion that a comparison of Plaintiff and Smith reveals "clear disparate treatment," in addition to being unpersuasive, is mere legal argument.

In addition, as part of Plaintiff's counter to this fact, he once again sets forth the argument that the SBP had somehow been incorporated into his pay and that he was subsequently "stripped of half his pay." There is simply no record support for this contention. To the contrary, it is undisputed that Plaintiff's compensation for 2003 was left unaffected as a result of this review (see Pl's admission in response to Fact 31).

otherwise satisfied the eligibility terms for a SBP benefit.[13]  (Salerno Decl. at ¶2).  In

January-March 2003, Plaintiff was never notified that his job was being eliminated as a result of

a job elimination/restructuring, nor was there a plan in place to eliminate Plaintiff's job.[14]  (Pl.

Dep. at 189-192; Salerno Decl. at ¶2; Mont. Dep. at 70-71, 89-90).

 A day or two after the February 2003 performance meeting, Plaintiff met separately with

Holt to discuss what actions he could take to save his job.  (Pl. Dep. at 140).  Holt advised him to

go over the items listed in his review, "make a list and present it back to Salerno."  (Pl. Dep. at

140).  Based on Holt's advice, Plaintiff prepared a plan for addressing the specific improvement

areas identified in his performance review and presented that plan to Salerno on February 21,

2003.  (Pl. Dep. at 114-17, 140-41 and ex. 10).  Plaintiff discussed his plan with Salerno, who

told him it was a good plan.  (Pl. Dep. at 116-17; Salerno Dep. at 118).  Plaintiff felt that it was

possible to accomplish the action items identified in the plan he submitted to Salerno.  (Pl. Dep.

at 117).

 The October 2002 and February 2003 performance reviews contained warnings that

Plaintiff *might* be fired if he did not improve his performance.  There is no record evidence to the

contrary (*i.e.*, that RH intended to fire Plaintiff).  In comparison, for example, Mr. Smith was

---

[13] Plaintiff counters this fact by asserting that he was told that he "would not receive the
SBP, regardless of his performance thereafter."  The Court agrees with Defendant that this is a
misstatement of the statements in the two performance reviews.  Neither of those reviews stated
that Plaintiff could never receive a SBP "regardless of his performance thereafter" if his job were
to be eliminated in a restructuring (which, in fact, is the main way to become eligible for a SBP
under the plan).

[14] Plaintiff offers a lengthy counter to this fact, much of which is unpersuasive legal
argument and none of which actually contradicts the fact itself.  To the contrary, Plaintiff
confirms that Salerno told him not to worry about the job posting (discussed in more detail,
*infra*). (Pl. Dep. at 119-20).

given a "Notice of Intent to Terminate for Continued Poor Performance," which concluded with the statement "we have decided to terminate your employment." (D701-702). Plaintiff has simply not created a dispute as to whether he received such a notice or that he was verbally told he was being fired. As of February 21, 2003 when he submitted his plan to Salerno, Plaintiff felt that if he continued to show significant improvement in the areas reflected in his plan, then he would be afforded additional time to continue to improve his performance. (Pl. Dep. at 256). As of February 21, 2003, Plaintiff's plan was to stay at RH and try to save his job. (Pl. Dep. at 117-18). Plaintiff admits that no one from RH ever told him that he was going to be fired. (Pl. Dep. at 102).

In February 2003, Robert Stewart, the new Area Manager for the Bristol Plant, decided with Salerno to develop a Maintenance Supervisor position for the Bristol Plant. (Salerno Decl. at ¶3). This new Maintenance Supervisor position was posted in February 2003. (Salerno Decl. at ¶6 and ex. 1). As described in this posting, the scope of supervisory responsibility for this new job was broader than the E/I area (managed in his foreman role by Plaintiff) and encompassed the entire Maintenance Department. (Id.) In contrast to Plaintiff's job as E/I shop foreman in which Plaintiff was expected to participate in and support activities within his E/I area, this new supervisor position was expressly intended to lead those activities for the entire Maintenance Department. (Salerno Dep. at 49-50). Since this new job reported to Salerno, it was not a replacement for Diehl. (Salerno Decl. at ¶5). Rather, this new position was developed because Salerno needed help supervising the entire Maintenance Department.[15] (Id.) Accordingly, this

---

[15] Plaintiff attempts to create a dispute about this fact by asserting that it "makes no sense." However, Montgomery's testimony established that it did, and Plaintiff presents no evidence to the contrary aside from this biased conclusion.

new job was intended to be an intermediate supervisory position between Salerno and the

Maintenance Department shop foreman. (Id.) The new position was not Plaintiff's job. (Salerno

Decl. at ¶5; Montg. Dep. at 91-92).[16] In or about March 2003, Stewart and Salerno hired Robert

O'Brien for this new position. (Salerno Decl. at ¶7). Mr. O'Brien's date of birth is August 24,

1947 (i.e., only a few years younger than Plaintiff). (Ex. I). After seeing the job posting for the

Maintenance Supervisor position, Plaintiff asked Salerno why that position had been posted. (Pl.

Dep. at 119). According to Plaintiff, Salerno told him, "[d]on't worry about it." (Pl. Dep. at

120). Plaintiff was not told by Salerno or anyone else at RH that the new Maintenance

Supervisor job posting was for his E/I shop foreman position. (Pl. Dep. at 123, 125).[17]

Despite being told by Salerno on February 21, 2003 that he had developed a good

performance improvement plan, Plaintiff decided to retire.[18] (Pl. Dep. at 118-19). Plaintiff

communicated his decision to retire in an e-mail to Salerno dated February 25, 2003, which read,

"I have notified Human Resources, Janice Holt, today of my desire to retire. The date will be

---

[16] Plaintiff's response is mere argument and does not contradict the testimony of Montgomery and Salerno. Plaintiff admits that he was never told by anyone that the new Maintenance Supervisor job posting was for his E/I shop foreman position.

[17] Plaintiff's response, while lengthy, does not contradict this admission. While many of the listed responsibilities may be similar to the formal description for Plaintiff's job, Plaintiff has not effectively disputed the fact that the area of responsibility for the new position encompassed the entire Maintenance Department, not just the E/I area for which Plaintiff was available (i.e., it was a position above Plaintiff's in the RH hierarchy, for which supervision of the E/I shop was but a part of the relevant duties).

[18] Plaintiff's response to this fact includes inappropriate argument and mischaracterizations of the record. Setting those aside, Plaintiff does not establish any real disputes of material fact. Indeed, Plaintiff's response confirms that he retired because of his mistaken assumptions about retiree health care benefits (about which he had never asked for clarification).

March 31, 2003, however, with my vacation and comp time I have left, I can't guarantee that I

will be working through to the thirty first." (Pl. Dep. at exh. 1). Plaintiff retired so as to preserve

his eligibility for retiree health care; as Plaintiff testified, he retired to "protect my investment

that I had with Rohm and Haas at the time … I had medical benefits that I would take with me if

I retired that I would lose if I was fired." (Pl. Dep. at 8). Plaintiff never received a document

saying he would lose eligibility for retiree health care if he was terminated for poor performance.

(Pl. Dep. at 35-37). No one at RH told Plaintiff before Plaintiff announced his retirement that he

would lose his health care benefits if he was terminated for poor performance. (Pl. Dep. at

35-37). Plaintiff admits that he chose to retire only on his assumption that he would lose his

retiree health care benefits if he was terminated for poor performance. (Pl. Dep. at 56). The only

other reason that Plaintiff retired was his assumption that his E/I shop foreman job was being

posted in the February 2003 posting for a Maintenance Supervisor that encompassed all

maintenance trades (*i.e.*, not just E/I). (Pl. Dep. at 118-119). No one at RH told Plaintiff that the

new Maintenance Supervisor job posting was for Plaintiff's E/I shop foreman job. (Pl. Dep. at

123, 125).[19]

---

[19] In addition to the facts and admissions detailed above, Plaintiff also made the following material admissions:

1.    The only RH employee who allegedly discriminated against Plaintiff was Salerno. As Plaintiff testified:
    Q: Other than Salerno, can you identify anyone at Rohm and Haas who discriminated against you because of your age?
    A: No.
    (Pl. Dep. at 145-146).

2.    Production Manager Salerno, Area Manager Stewart and Site Manager Montgomery never referenced Plaintiff's age in any conversation or document. (Pl. Dep. at 131-133).

3.    Plaintiff never complained to anyone at RH about age discrimination, and he never mentioned age discrimination in any conversation or document.

**III. Summary Judgment Legal Standard**

Under Fed. R. Civ. P. 56©, summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to a material fact and that the moving party is entitled

to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);

Fed. R. Civ. P. 56©. In order to defeat a motion for summary judgment, disputes must be both

(1) material, meaning concerning facts that will affect the outcome of the issue under substantive

law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a

verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is mandated "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. An issue is genuine if the fact

---

(Pl. Dep. at 150-151).
4.     Plaintiff is not aware of any younger RH employee who got a SBP when that
       employee should not have received a SBP.
       (Pl. Dep. at 149).
5.     While Plaintiff asserts the fact that his February 14, 2003 performance evaluation
       was discriminatory, he can only speculate as to why: "So they could scare me out
       of a job. I was pretty vulnerable."
       (Pl. Dep. at 146).
6.     Plaintiff cannot identify any other RH employee of comparable age who received
       a negative performance evaluation that was designed to force retirement.
       (Pl. Dep. at 149).
7.     When asked why he felt the February 2003 posting of the Maintenance Supervisor
       position to be age discrimination, Plaintiff could only speculate: "I was at the time
       of my life when I could retire, so I think it was just another nudge…This
       happened right after I presented him with the list. This came out the next day. I
       thought it was one big game to make a decision to get out of the place, and they
       would save a bunch of money. … The money was to be saved from SBP. They
       wouldn't have to give it to me." (Pl. Dep. at 148).

finder could reasonably return a verdict in favor of the non-moving party with respect to that issue.  <u>Anderson</u>, 477 U.S. at 248.  In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion."  <u>Seigel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d 1125, 1127 (3d Cir. 1995).

## IV.  Discussion

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions, or privileges of employment on the basis of their age.  <u>See</u> 29 U.S.C. § 623(a)(1).[20]  Age discrimination may be established by direct or indirect evidence. <u>See</u> <u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 972 (3d Cir.1998).  The *prima facie* elements for a claim of age discrimination under the ADEA are: the plaintiff "(1) was a member of a protected class, *i.e.*, the employee was over forty; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination."  <u>Duffy v. Paper Magic Group, Inc.</u>, 265 F.3d 163, 167 (3d Cir. 2001); <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992).  To survive a motion for summary judgment, the evidence must be "sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case."  <u>Id</u>. (quoting <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc)).

Where, as here, Plaintiff was not terminated (*i.e.*, in a indirect evidence situation), Plaintiff must establish that he was constructively discharged in order to satisfy the "adverse employment decision" element of a *prima facie* case.  The necessary predicate to maintain a

---

[20] ADEA and PHRA claims are analyzed in the same manner.  <u>Connors</u>, 160 F.3d at 972.

constructive discharge claim is that there were conditions of discrimination so intolerable that a reasonable person would have felt compelled to resign. Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718 (3d Cir. 1997); Goss v. Exxon Office Systems Co., 747 F.2d 885, 887-88 (3d Cir. 1984); see also, e.g., Tunis v. City of Newark, 184 Fed. Appx. 140, 141 (3d Cir. 2006) (same). The standard for evaluating claims of constructive discharge is an *objective* one: "a court must determine whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." Duffy, 265 F.3d at 167 (quotation marks and citation omitted); see also Gray, 957 F.2d at 1079 ("We employ an objective test in determining whether an employee was constructively discharged from employment: whether the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employees shoes would resign."); see also Schafer v. Bd. of Pub. Educ., 903 F.2d 243, 248-50 (3d Cir. 1990); Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1230 (3d Cir. 1988); Spangle v. Valley Forge Sewer Auth., 839 F.2d 171, 173 (3d Cir. 1988).[21]  For purposes of establishing a constructive discharge:

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign.  Rather, intolerability . . . is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign, -- that is,

---

[21] Goss, Levendos and Schafer are Title VII cases, but the doctrine of constructive discharge is the same in all employee discrimination claims such as those under the ADEA. Gray, 957 F.2d at 1079 n.5.

whether he would have had no choice but to resign.

Connors, 160 F.3d at 976 (internal quotation marks and citation omitted).  Negative, uncomfortable, or stressful work environments are not objectively "intolerable" to support a claim of constructive discharge, and the Court agrees with Defendant that the Third Circuit has emphasized that the standard for establishing a constructive discharge is a very demanding one.

In Duffy, for example, the plaintiff alleged that a "pattern of discriminatory treatment" forced her to resign.  That alleged pattern of age discrimination was presented to the court in a ten-item list that included: the plaintiff not being considered for a promotion; negative remarks about the plaintiff's age by her supervisors (e.g., "she was getting older and wasn't remembering things as she got older"); understaffing in the plaintiff's department which required the plaintiff to work longer hours; the exclusion of the plaintiff from a training seminar for managers and removal from work-related committees; the exclusion of the plaintiff from the hiring process for her department; and the denial of overtime to the plaintiff that was given to others.  Duffy, 265 F.3d at 167-68.  In her deposition, the plaintiff testified that she "just couldn't take it anymore" and that in her opinion, she "was just being forced out."  Id. at 171.  While the court acknowledged that this work environment was stressful, it noted that "a stressful environment does not amount to a constructive discharge."  Id. at 170.  In affirming a summary judgment dismissal of the ADEA constructive discharge claim, the court held that the plaintiff's "situation does not reach the threshold of 'intolerable conditions.'  Although certainly stressful and frustrating, the alleged conduct would not compel a reasonable person to resign."  Id. at 169.  As to the ageist comments directed at the plaintiff, the court held: "Although these comments were inappropriate, they were not sufficiently derogatory or offensive to compel a reasonable person to

resign." Id. at 170.

In Connors, the plaintiff's claim of constructive discharge was based, in part, on ambiguity in a general offer of continued employment following a merger and uncertainty over whether that offer was "definitive." Yet, since the plaintiff did not adequately attempt to resolve his uncertainty through questions to the new merged entity, the Court affirmed the summary judgment dismissal of the ADEA constructive discharge claim:

> [T]o the extent that the general offer of employment can be labeled ambiguous, Connors had a duty to attempt to clarify the situation before retiring. Conners did not try, and so he cannot rely on any ambiguity to support his constructive discharge claim. … [I]n most situations, a prerequisite to a successful constructive discharge claim is that the plaintiff attempted to explore alternatives before electing to resign.

160 F.3d at 975 (quotation marks and citation omitted).[22]

Under this analytical rubric, Plaintiff's claims based on constructive discharge cannot

---

[22] It is worth mentioning that Gray, a 2006 non-precedential opinion, involved a situation quite similar to ours, wherein an employee retired because she assumed that she would not receive retiree health benefits if she did not. The Third Circuit affirmed summary judgment dismissal of the ADEA constructive discharge claims under the objective standard, noting that a constructive discharge claim cannot be supported by a plaintiff's assumptions:

> [I]t cannot reasonably be argued that [plaintiff] was involuntarily terminated when she acted on her assumption -- after close to four decades of employment -- without in any way verifying whether her assumption was correct… [T]he employer cannot be said to have constructively discharged the employee on the ground that the employee "assumed the worst"…. [T]he fact that [plaintiff] did not make any further inquiry, in addition to the fact that she did not complain to anyone regarding her predicament, indicates that her decision to retire was voluntary.

Gray, 957 F.2d at 1086.

survive summary judgment.  The facts reveal that Plaintiff's constructive discharge claim rests on two events – the February 2003 review given to him by Salerno, and the February 2003 posting of a Maintenance Supervisor position.  The Court finds that neither of these two events created an environment that was so objectively intolerable that a reasonable person would have felt compelled to resign.

First, the Court agrees that the February 2003 review tracks prior reviews and stems from negative manager feedback the Plaintiff does not challenge was presented to his superiors well prior to February 2003.  Moreover, Plaintiff concedes the February 2003 review was presented in a professional manner (without any reference to age), identified areas for specific improvement, and that Salerno approved the idea of weekly meetings to track Plaintiff's *desired* improvement. *As such, the facts reveal that Plaintiff did not act in accordance with the view that the February 2003 review compelled him to resign.*  Rather, Plaintiff responded to that review by developing a plan for improvement that he presented to Salerno on February 21, 2003.  Accordingly, it is not surprising that Plaintiff admitted that as of that date *he planned to stay on at RH*.  This does not meet a subjective, let alone the required objective, standard for constructive discharge.[23]

Second, the Court finds that the February 2003 job posting for the Maintenance Supervisor position also fails to meet the standard for a constructive discharge claim.  *The job*

---

[23] As discussed *supra*, Plaintiff's attempt to connect the February 2003 review to his decision to retire rests on Plaintiff's erroneous assumption that if his employment was terminated for poor performance, he feared he would lose his retiree healthcare.  However, the facts reveal that Plaintiff's assumptions were just that – assumptions.  Plaintiff never asked anyone at RH whether he would lose his retiree health care benefits in a performance-based termination (and, indeed, under the Plan, Plaintiff would not have lost them in such circumstances).  Plaintiff's decision to retire based on an erroneous assumption regarding a benefit is not a constructive discharge.

*posting was not for Plaintiff's job*.  No one ever told Plaintiff otherwise.  To the contrary, and, once again, Plaintiff's erroneous assumptions cannot support a constructive discharge claim.

The record demonstrates that Plaintiff had worries he failed to address, which he coupled with (a) subjective notions unsupported by facts and (b) assumptions concerning RH policies and RH's approach to him and his job.  As a result, Plaintiff felt, however erroneously, that it was in his best interest to retire.  None of these reasons meets the high objective standard for constructive discharge.  Stated differently, Plaintiff has not adduced any evidence to create genuine issues of material fact concerning whether he objectively had no choice (*i.e.*, was compelled) to resign.

Plaintiff is correct that summary judgment should be denied if competing inferences can be drawn from the undisputed facts on material issues.  Hunt v. Cromartie, 526 U.S. 541 (1999).  However, the Court does not find validly competing inferences here that would prevent a grant of summary judgment in favor of Defendant.

## V.  Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment shall be granted.  Judgment shall be entered in favor of Defendant and against Plaintiff.  This matter shall be closed.